UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

BRAVIA CAPITAL PARTNERS, INC.,    :

    :

             Plaintiff,    :

    :

   -against-             :   No. 09 Civ. 6375 (JFK)

    :   **Opinion and Order**

MARYANNE FIKE,    :

    :

           Defendant.   :

------------------------------------X

APPEARANCES:

     FOR PLAINTIFF BRAVIA CAPITAL PARTNERS
     William C. House, Esq.
     170 Broadway, Suite 600
     New York, New York 10038

     FOR DEFENDANT MARYANNE FIKE
     Herbert Rubin, Esq.
     Herzfeld & Rubin, P.C.
     125 Broad Street
     New York, New York 10004

**JOHN F. KEENAN, United States District Judge:**

Before the Court is Defendant Maryanne Fike's ("Fike" or "Defendant") motion to dismiss this declaratory judgment employment action and Plaintiff Bravia Capital Partners' ("Bravia" or "Plaintiff") cross motion to dismiss the Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth counterclaims. For the reasons that follow, Defendant's motion is denied and Plaintiff's motion is granted in its entirety.

I.   Background

A.   Employment Agreement

The following facts, as alleged in the Answer and the employment contract submitted by both parties, are accepted as true for the purposes of these motions.  Bravia is a New York corporation which provides financing and other services to the aviation industry.  In an attempt to expand its business, on November 1, 2006, Bravia hired Fike, a New Jersey resident, as an independent contractor.  Her official title was Director of Business Development, and her main job function was "bringing in new clients (primarily commercial airlines) that [Bravia] might look to offer [its] structured finance products or [its] private equity investments."  (Compl., Ex. A).  The parties memorialized this employment arrangement in a single page letter dated December 14, 2006.  Remarkable for its vagueness, the employment letter's main purpose is to define "our financial arrangements." (Id.).  The parties contemplated a tiered compensation system for Fike based on "any transactions that close":  she would receive a flat fee of 5% of any gross fees paid to Bravia related to an "in-house" transaction on which she worked, i.e., a transaction with Bravia's existing client, but for any new client that she brought to the firm, she would receive 10% of the first $500,000 in gross fees Bravia earned, 15% of fees between $500,000 and $1 million, and 20% of any fees in excess

2

of $1 million.  (Id.).  Thus, under the broadly phrased agreement, the only condition precedent to Fike's receipt of commission payments is the closing of a transaction with a client she serviced.  The employment contract does not include any terms requiring Fike to be employed at the time a transaction closes in order to be paid.

In January 2008, the parties decided to modify the compensation schedule in the December 14, 2006 employment letter.  Beginning January 31, 2008, Fike would receive a monthly salary of $5,000 and a reduced percentage of gross fees earned.  Specifically, for any new client Fike brought to Bravia for which a transaction closed, she would receive 9% of the first $500,000 in gross fees earned.  Bravia terminated Fike's employment in February of 2009.

## B.   Disputed Transactions

Bravia subsequently brought this declaratory judgment action seeking judgment that Bravia does not owe Fike any additional compensation in connection with various deals.  In six of her counterclaims, Fike contends that Bravia owes her commissions and expenses related to transactions that have closed (including, but not limited to, deals in which Bravia provided structured finance products or private equity investment), transactions that are in the process of closing, and transactions that are expected to close in the future with

3

clients Fike introduced to Bravia.  Only those counterclaims
that are the subject of the instant motion are discussed below.

### 1.    Galaxy Airlines

In December 2008, Bravia entered into a letter of intent
with Galaxy Airlines, Co. Ltd. ("Galaxy Airlines") for the
purchase of one airliner.  The deal was originally slated to
close in December of 2008, but it did not.  In her fifth
counterclaim, Fike alleges that Bravia acted in bad faith by
engaging in a series of pretexts to delay the closing of the
agreement with Galaxy Airlines, and that the Galaxy Airlines
transaction fell through in January 2009 due to Bravia's failure
to execute the purchase contract.  Further, Fike alleges that
Bravia and Galaxy Airlines nonetheless continue to discuss the
proposed transaction.  Fike claims that she sustained damages in
excess of $3 million – that is, the compensation she expected to
earn on the Galaxy Airlines deal – due to Bravia's bad faith
failure to complete the transaction.

### 2.    Air Berlin

In February 2009, Bravia entered into an agreement with Air
Berlin to arrange financing for the purchase of several
aircraft.  Fike made the initial contact with Air Berlin.  In
her sixth counterclaim, Fike alleges that the Air Berlin deal
consisted of an initial financing for ten aircraft, with
additional financing for other planes to be negotiated later.

She claims that an unnamed Bravia employee was hostile to Air Berlin's attorney, and, as a result, the attorney "indicated that she was unwilling to continue with the transaction." (Answer ¶ 136). Fike alleges that Bravia's expected fees for the first tranche of aircraft financing was in excess of $10 million, with an additional $10 million to follow from other aspects of the transaction. Consequently, she claims that Bravia's hostile conduct and failure to close the Air Berlin deal will or has deprived her of at least $2 million in compensation.

## C.   Additional Counterclaims

Fike pleads four additional counterclaims relating to her termination. In her seventh counterclaim, she alleges that her discharge was the result of negligent or willful misconduct by Bravia to prevent her from earning compensation, entitling her to $10 million in damages. In her eighth counterclaim, Fike alleges that Bravia continues to pursue fee-generating transactions with unspecified clients she brought in, entitling her to $10 million in damages to compensate for Bravia's unjust enrichment. Her ninth counterclaim appears to be premised on wrongful termination. Finally, in her tenth counterclaim, Fike alleges that Bravia has refused to produce documents, supplied her with false and incomplete data on the relevant transactions, and structured the transactions in such a way that she cannot

accurately ascertain the full compensation to which she is
entitled.

## II.  Cross Motions to Dismiss

### A.  Defendant's Motion to Dismiss the Declaratory Judgment Action

Defense counsel asserts that on June 19, 2009 he sent
Plaintiff's counsel a copy of a complaint he intended to file on
behalf of Fike against Bravia.  Instead of responding, Bravia
filed an action in New York County Supreme Court for declaratory
relief pursuant to CPLR § 3001.[1]  Fike then removed the case to
this Court based on diversity of citizenship.  She additionally
filed ten counterclaims, which represent the claims she intended
to file in her own complaint.  Fike concedes that all of the
issues between the parties have been raised, and the action is
proceeding in the jurisdiction where she would originally have
filed her complaint.  Nevertheless, Fike moves to dismiss the
declaratory judgment action, essentially asking the Court to
reverse the parties and declare the counterclaims to be the
complaint on the ground that the declaratory judgment action is
an improper race to the courthouse.

The decision to entertain or dismiss a declaratory judgment
action rests within the court's discretion.  In defining the

---

[1] The parties agree that New York law governs this action and the
counterclaims.

boundaries of that discretion, the New York Court of Appeals has held that a court

> may decline to hear the matter if there are other adequate remedies available, and it must dismiss the action if there is already pending between the parties another action in which all the issues can be determined. The mere existence of other adequate remedies, however, does not require dismissal: "We have never gone so far as to hold that, when there exists a genuine controversy requiring a judicial determination, the Supreme Court is bound, solely for the reason that another remedy is available, to refuse to exercise the power conferred by [the predecessor statutes to CPLR 3001]."

Morgenthau v. Erlbaum, 451 N.E.2d 150, 153 (N.Y. 1983) (quoting Woollard v. Schaffer Stores Co., Inc., 5 N.E.2d 829, 832 (N.Y. 1936)).

Fike primarily relies on two federal cases in support of her motion; although they involve the Declaratory Judgment Act, those courts considered similar factors in dismissing declaratory judgment actions, most importantly the existence of another pending action such that res judicata is at stake. For example, in Great American Insurance Co. v. A.G. Ship Maintenance Corp., 368 F. Supp. 2d 364 (S.D.N.Y. 2005), the day after a declaratory judgment action was filed in the Southern District of New York, defendant filed a coercive action in New Jersey state court. Judge Kaplan declined to declare the rights of the parties and instead dismissed the case so that it could proceed in New Jersey. Id. at 365-66 ("The New Jersey action

affords a remedy at least equal in efficacy to any that could be provided in this forum.  No useful purpose would be served by this Court proceeding to declare the rights of the parties when the New Jersey court necessarily will do precisely the same thing in determining whether to grant or deny coercive relief."). Similarly, in Sturge v. Diversified Transport Corp., 772 F. Supp. 183 (S.D.N.Y. 1991), ten days after the filing of a declaratory judgment action in federal court, the defendants in that action filed a separate suit in New York state court. There, Judge Leisure dismissed the declaratory judgment action where the only way to prevent the parties from litigating the same issues in two fora would be to issue an order enjoining the contemporaneous state action.  Id. at 188; accord Great Am. Ins. Co. v. Houston Gen. Ins. Co., 735 F. Supp. 581, 586 (S.D.N.Y. 1990) ("[T]he misuse of the Declaratory Judgment Act to gain a procedural advantage and preempt the forum choice of the plaintiff in the coercive action militates in favor of dismissing the declaratory judgment action.").

None of the factors articulated in Morgenthau or the cited federal cases are present here.  There are no other pending actions between the parties in any court.  The parties concede that all claims have been raised in this action, and, in removing the state court action to this Court, Fike has had her choice of forum.  While the filing of the declaratory judgment

action does indicate a certain amount of gamesmanship on the part of Bravia, this Court is in the position to resolve the underlying controversy among the parties, and, thus, entertaining the declaratory judgment action will serve a useful purpose.  There are no offsetting concerns about the race to res judicata and no risk that a decision by this Court will interfere with sovereign relations or waste judicial resources. Fike's motion amounts to little more than a procedural distraction; therefore, the Court declines to exercise its discretion to dismiss the declaratory judgment action and reverse the parties' positions.

### B.   Plaintiff's Motion to Dismiss Certain Counterclaims

Bravia moves to dismiss six of the ten counterclaims.  On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept the factual allegations of the counterclaims as true and draw all reasonable inferences in favor of the non-moving party. Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d Cir. 2008).  The court, however, is not required to accept as true conclusory allegations or "a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986).  The district court's function "is merely to assess the legal feasibility of the [counterclaims], not to assay the weight of the evidence which might be offered

in support thereof." Geisler v. Petrocelli, 616 F.2d 636, 639
(2d Cir. 1980).  Therefore, a counterclaim will be dismissed
only where it fails to set forth sufficient facts to state a
claim for relief that is "plausible on its face." Bell Atl.
Corp. v. Twombly, 550 U.S. 544, 570 (2007).

### 1.    Fifth and Sixth Counterclaims

As broadly drafted as the employment letter may be, the
parties took care to specify that Fike was to be compensated
only for transactions that close.  The fifth and sixth
counterclaims admit that no transactions with Galaxy Airlines or
Air Berlin have closed to date; therefore, no claim for breach
of contract will lie.  Instead, the general theme of Fike's
fifth and sixth counterclaims is that Bravia's conduct
jeopardized the Galaxy Airlines and Air Berlin deals in
violation of an implied duty to act in good faith.

New York law implies in every contract a duty of good faith
and fair dealing in the course of performance. Dalton v. Educ.
Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995).  "This embraces
a pledge that 'neither party shall do anything which will have
the effect of destroying or injuring the right of the other
party to receive the fruits of the contract.'" Id. (quoting
Kirke La Shelle Co. v. Paul Armstrong Co., 188 N.E. 163, 167
(N.Y. 1933)); see 511 W. 232nd Owners Corp. v. Jennifer Realty
Co., 773 N.E.2d 496, 500 (N.Y. 2002).  The bounds of this

implied duty are not limitless; for example, "the implied
obligation is in aid and furtherance of other terms of the
agreement of the parties.  No obligation can be implied,
however, which would be inconsistent with other terms of the
contractual relationship." Murphy v. Am. Home Prods. Corp., 448
N.E.2d 86, 91 (N.Y. 1983).  Moreover, "the implied covenant does
not extend so far as to undermine a party's 'general right to
act on its own interests in a way that may incidentally lessen'
the other party's anticipated fruits from the contract." M/A-
Com Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990)
(quoting Van Valkenburgh, Nooger & Neville, Inc. v. Hayden
Publ'g Co., 281 N.E.2d 142, 145 (N.Y. 1972)).  Similarly, "the
implied covenant can only impose an obligation consistent with
other mutually agreed upon terms in the contract.  It does not
add to the contract a substantive provision not included by the
parties." Broder v. Cablevision Sys. Corp., 418 F.3d 187, 198-
99 (2d Cir. 2005) (internal quotations and citations omitted).

     Under the terms of the contract, Fike undertook to bring in
new clients for Bravia.  However, the parties agree that there
is no duty, express or implied, that Bravia must execute deals
with every prospective client Fike brought through the door.
Indeed, after the compensation arrangement was revised, Fike
received a monthly salary regardless of whether she brought in
any clients or whether Bravia successfully negotiated

transactions with those clients.  This further indicates that the parties expected that not every proposed transaction would close even though Fike had fully performed.  The terms of the employment contract encouraged Fike to produce high quality clients, but the contract did not impose on Bravia a concomitant duty to close these transactions.  Thus, it cannot be said that Bravia's failure to close transactions, standing alone, is a breach of the implied duty of good faith that entitles Fike to damages.  To hold otherwise would be to impose an impractical obligation on Bravia that goes well beyond the contemplation of the parties, and would in essence add a substantive term into the contract that both parties agree does not exist.

That is not to say that Bravia can conduct business transactions involving Fike with abandon.  The employment contract may require Bravia to enter into good faith negotiations with clients Fike brought in, with the goal of completing transactions.  However, the conduct alleged fails to establish any plausible claim that Bravia did not fulfill its obligations.  Fike concedes that both the Air Berlin and Galaxy Airlines deals progressed past the point of introduction, and Bravia executed letters of intent with both clients; the fact that the transactions ultimately did not close, without more, does not indicate bad faith by Bravia with respect to its employment relationship with Fike.  There is no contention that

12

the company encouraged the unnamed employee to behave badly so the Air Berlin deal would fall through.  Nor is there a contention that Bravia decided not to go through with the Galaxy Airlines deal for any improper purpose; it may simply have been a business judgment.  As Bravia pays Fike only a small percentage of gross profits earned, the employer stands to lose much more than the independent contractor if its conduct prevents a transaction from closing.  These financial incentives make an inference of bad faith conduct even less colorable.

Fike additionally argues that Bravia breached a duty of good faith by meeting with her clients outside of her presence and by demanding that she turn over her clients' business cards.  However, Fike was an at-will employee, giving Bravia broad discretion to terminate her employment for any reason or for no reason at all.  The Court will not imply into the employment contract an obligation that would punish Bravia's alleged conduct where to do so would irreconcilably conflict with the terms of the at-will employment relationship.  See Baguer v. Spanish Broad. Sys., Inc., No. 04 Civ. 8393, 2007 WL 2780390, at *11 (S.D.N.Y. Sept. 20, 2007) ("Under the employment contract, [defendant] had the authority to terminate Plaintiff's employment at any time and for any reason.  Possessed of this greater power to terminate the contract, [defendant] also had the authority to reallocate Plaintiff's accounts.  As such, an

implied term prohibiting [defendant] from reallocating Plaintiff's accounts would be inconsistent with other terms of the contractual relationship, namely, the at-will employment provision." (internal quotations omitted)).

Consequently, the fifth and sixth counterclaims do not state a general claim for breach of the implied duty of good faith and are dismissed with leave to replead.

### 2.   Seventh Counterclaim

In her seventh counterclaim, Fike contends that her "termination was the result of negligent or willful misconduct by [Bravia] as aforesaid, to frustrate the opportunity for Fike to earn compensation in accordance with [Bravia's] agreements." (Answer ¶ 143).  Whereas the fifth and sixth counterclaims were premised on Bravia's failure to close transactions, the Court broadly construes the seventh counterclaim to state that Bravia breached the implied duty of good faith by firing Fike to avoid paying her commissions on gross fees it may earn after February of 2009.

As previously discussed, although New York courts will imply a duty of good faith into all contracts, they generally cannot imply an obligation in contradiction to the terms of the contract or an employer's ability to terminate at-will employees.  However, Fike premises her claim on Wakefield v. Northern Telecom, Inc., 769 F.2d 109 (2d Cir. 1985), which

recognized a limited exception to this general New York rule.
In Wakefield, a salesman earned commissions governed by a
compensation agreement specifying that he must be employed on
the date a commission would be paid.  Id. at 111.  The employer
fired the salesman after he had secured a number of sales, but
before his commissions were to be paid.  Id.  In spite of the
contractual provision that the employee must be employed at the
time commissions would be paid, the Court of Appeals for the
Second Circuit allowed the salesman to proceed to a jury to
recover unpaid commissions on the theory that his employer
breached the implied duty of good faith in that his termination
was motivated by his employer's "desire to avoid paying him
commissions that were virtually certain to become vested."  Id.
at 114.  The Court noted that plaintiff could recover in spite
of the unfulfilled contractual requirement if the jury found
that the termination was substantially motivated by the
employer's desire to avoid paying commissions; however, if the
jury found that the termination was motivated, for example, by a
reduction in the work force or poor performance, recovery would
be barred.  Id. at 113.  To justify this seeming contradiction,
the Court of Appeals noted that "[i]mplied contractual
obligations may coexist with express provisions which seemingly
negate them where common expectations or the relationship of the
parties as structured by the contract so dictate."  Id. at 112.

However, four years later the New York Court of Appeals
handed down an opinion in Gallagher v. Lambert, 549 N.E.2d 136
(N.Y. 1989) which ignored but nevertheless questioned by
implication the holding in Wakefield.  In Gallagher, plaintiff
purchased stock in the employer corporation subject to mandatory
buy back by the corporation if the employee was terminated or
resigned.  Id. at 136.  Plaintiff argued that his termination
was opportunely timed so that his employer could avoid paying a
higher price to buy back his shares.  Id. at 137.  The Court
dismissed plaintiff's claim, rejecting any consideration of the
employer's motivation for his termination, strongly reaffirming
a New York employer's "unfettered discretion to fire [an
employee] at any time."  Id. at 138.  Thus, Wakefield's
continued validity in this District is unclear.  Compare Baguer,
2007 WL 2780390, at *10 (recognizing Wakefield claim by
distinguishing case at bar from Gallagher where contract did not
require plaintiff to be employed at time commissions were to be
paid), and Knudsen v. Quebecor Printing (U.S.A.) Inc., 792 F.
Supp. 234, 240 (S.D.N.Y. 1992) ("The Court concludes that
Gallagher does not disturb the authority of Wakefield, at least
in the context of employment sales commission provisions.  In
light of the above, Defendant's motion to dismiss Plaintiff's
claim that Defendant violated its implied covenant of good faith
and fair dealing by terminating him in order to avoid paying

sales commissions is hereby denied."), with Plantier v. Cordiant
plc, No. 97 Civ. 8696, 1998 WL 661474, at *3 (S.D.N.Y. Sept. 24,
1998) (dismissing claim under Wakefield that employer fired
plaintiff to avoid paying discretionary bonus because "[i]n
cases where no fixed amount was due at the time of termination,
courts have refused to place a restriction on employer's
unfettered discretion to fire an at-will employee at any time"),
and Collins & Aikman Floor Coverings Corp. v. Froehlich, 736 F.
Supp. 480, 486 (S.D.N.Y. 1990) ("The Court in Gallagher
reiterated the applicability of the employment at-will rule and
reconfirmed that a departure from the clear and unambiguous
written agreement between parties is not permissible.  Reliance
upon Wakefield turned out to be in error under New York law.").

The Court agrees that Wakefield may be distinguished from
Gallagher on its facts such that Wakefield claims are still
viable in employment sales commission cases.  Nevertheless, the
counterclaim fails to allege sufficient facts to state a
plausible Wakefield claim.  As Fike has not identified any
transactions that have closed since her termination, she has
pleaded neither a breach of the implied duty of good faith nor
injury.  The closest allegation the Court can cobble together
from the counterclaims is that Bravia delayed execution of the
Galaxy Airlines deal, fired Fike, then revived negotiations of
the transaction to avoid paying her commissions.  But an

allegation of delay is not enough to satisfy <u>Twombly</u>'s pleading standard; if and when the Galaxy Airlines transaction closes, it is possible that Bravia will pay Fike her due, in which case there is no breach of the employment agreement.  If the Galaxy Airlines transaction never closes, then Fike would not be entitled to any commission under the contract, leaving her with nothing more than the previously rejected claim that Bravia's failure to close the transaction violated an implied duty of good faith.

Allowing the seventh counterclaim to proceed as pleaded also runs afoul of the legal considerations underpinning the <u>Wakefield</u> decision.  Specifically, the Court of Appeals focused on the need to imply a term into the contract to effectuate the expectations and intent of the parties.  <u>Wakefield</u>, 769 F.2d at 112.  However, the employment agreement at issue here contemplates more than just Fike's performance as a condition to her receiving commissions; the parties understood that Fike would only receive a percentage of gross fees after a transaction closed.  This is only logical, as Bravia could not pay Fike a portion of its fees until those fees were earned.  In other words, Fike has not been deprived of the benefit of the employment agreement unless or until Bravia earns fees from her client and refuses to pay her share.  If the Court were to allow Fike to proceed on a <u>Wakefield</u> claim absent an allegation that

some transaction has closed since her termination, it would essentially erase the condition precedent of a closed transaction from the contract as the parties intended. Furthermore, to allow Fike to recover for her termination in the absence of any financial injury derived from the compensation agreement – i.e., based solely on Bravia's alleged bad motivation for her termination – would fly in the face of New York's staunch rejection of wrongful termination claims. See DCMR v. Trident Precision Mfg., 317 F. Supp. 2d 220, 226 (W.D.N.Y. 2004), aff'd, 110 F. App'x 205 (2d Cir. 2004) (dismissing Wakefield claim where "plaintiff has failed to offer any evidence that it is entitled to additional [commission] payments under the contract. Plaintiff's claim for breach of the implied covenant of good faith and fair dealing cannot substitute for an unsustainable breach of contract claim"). The seventh counterclaim fails to plead any facts to support a Wakefield claim, and is therefore dismissed with leave to replead.

### 3. Eighth Counterclaim

Fike claims that Bravia contrived to fire her and thereafter "has continued and intends to continue to exploit Fike's accomplishments in bringing new clients to [Bravia]." (Answer ¶ 146). As a result, Bravia has allegedly been unjustly enriched.

New York law does not recognize recovery in quasi-contract where there is a valid contract governing the subject matter of the claim.  Instead, unjust enrichment "is an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned.  Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded."  IDT Corp. v. Morgan Stanley Dean Witter & Co., 907 N.E.2d 268, 274 (N.Y. 2009); see EBC I, Inc. v. Goldman, Sachs & Co., 832 N.E.2d 26, 33-34 (N.Y. 2005); Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987) ("It is impermissible, however, to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties.").

Here, there is no dispute about the validity of the employment agreement between Fike and Bravia.  The contract details the "financial arrangements" between the employer and its independent contractor.  All of Fike's claims concern commissions and expenses arising out of transactions that closed or may close with clients she allegedly introduced to Bravia. Any damages to which Fike may be entitled are related to

services she performed in connection with her employment, and all of her claims are governed by the employment agreement.[2] Therefore, the eighth counterclaim fails to state a legally cognizable claim and is dismissed with prejudice.

### 4.   Ninth Counterclaim

In her ninth counterclaim, Fike claims that she was wrongfully terminated, and thus is entitled to compensation she earned while employed at Bravia as well as compensation reasonably expected to be earned but for her termination.  There is no question that Fike was an at-will employee, and her employment agreement contains no term of duration.  New York law does not recognize a claim for wrongful termination in such a case.  See De Petris v. Union Settlement Ass'n, Inc., 657 N.E.2d 269, 271 (N.Y. 1995) ("Absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party.  This State neither recognizes a tort of wrongful discharge nor requires good faith in an at-will employment relationship."); Murphy, 448 N.E.2d at 89-90.  The ninth counterclaim fails to state a claim for wrongful termination under New York law and is dismissed

---

[2] To the extent Fike argues that she performed some other services not governed by her employment contract for which she is entitled to compensation, the pleadings are devoid of any factual allegations establishing what those services may be or how they could be considered outside the scope of the employment agreement.

with prejudice.  To the extent this counterclaim purports to put forth a <u>Wakefield</u> claim, it is duplicative of the seventh counterclaim, and is likewise dismissed.

### 5.    Tenth Counterclaim

The tenth counterclaim alleges that Bravia:  (1) structured its transactions using special purpose corporations and special purpose vehicles such that the gross fees on which Fike's compensation was based appeared to be less than reality (Answer ¶ 156); and (2) provided "false and incomplete data on which to compute her compensation."  (<u>Id.</u> ¶ 158).  Defense counsel states that this is a tort claim without reference to any tort in particular; thus, the Court construes this counterclaim to assert a cause of action for fraud.

The essential elements of a fraud claim under New York law are the "representation of a material existing fact, falsity, scienter, deception and injury."  <u>New York Univ. v. Cont'l Ins. Co.</u>, 662 N.E.2d 763, 769 (N.Y. 1995).  "As a general rule, to recover damages for tort in a contract matter, it is necessary that the plaintiff plead and prove 'a breach of duty distinct from, or in addition to, the breach of contract.'"  <u>Non-Linear Trading Co., Inc. v. Braddis Assocs., Inc.</u>, 675 N.Y.S.2d 5, 13 (N.Y. App. Div. 1998) (quoting <u>N. Shore Bottling Co. v. C. Schmidt & Sons, Inc.</u>, 239 N.E.2d 189, 193 (N.Y. 1968)).  A party "may be liable in tort when it has breached a duty of reasonable

care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations." New York Univ., 662 N.E.2d at 767.  Therefore, to state a fraud claim stemming from a breach of contract, New York law requires the claimant to: "(1) demonstrate a legal duty separate from the duty to perform under the contract; (2) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (3) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." W.B. David & Co., Inc. v. DWA Commc'ns, Inc., No. 02 Civ. 8479, 2004 WL 369147, at *4 (S.D.N.Y. Feb. 26, 2004); see Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996).

Initially, the Court notes that the general theme of the tenth counterclaim is that Bravia paid Fike less than she is owed under the employment contract.  In two counterclaims that are not the subject of this motion, Fike alleged that Bravia misrepresented its gross profits on transactions with Avion Airways and All Nippon Airlines which closed during her tenure.[3]

---

[3] In her first counterclaim, Fike alleges that Bravia paid her in connection with the Avion Airways deal based on purported gross profits of $200,000 when Bravia will earn in excess of $1 million. (Answer ¶¶ 95-97).  Similarly, in her second counterclaim, Fike alleges that Bravia paid her for the All Nippon Airlines deal based on stated gross profits of $1.5

In contrast to the allegations in the first and second counterclaims, the tenth counterclaim identifies no additional transactions, whether they have closed, no representation by Bravia as to its gross profits, or the amount of commissions outstanding as a result of some unspecified misrepresentation. Therefore, any claims stemming from Bravia's misrepresentation of gross profits on deals that have closed are factually repetitive of the first and second contract counterclaims.

The additional factual allegations in the tenth counterclaim do not save it from dismissal.  As to the first contention regarding the structuring of transactions, Fike has provided no legal support for the claim that Bravia has a duty to execute transactions in any particular way; as Fike agrees that Bravia is not obligated to close deals at all, certainly there cannot exist an extra-contractual duty of reasonable care owed to an independent contractor regarding the structuring of business transactions with the employer's clients.  The only duty the law imposes, and which Bravia undertook in the employment contract, is to pay Fike a portion of gross profits earned.  Thus, any breach of that duty is recoverable in contract.

---

million when Bravia will earn in excess of $3 million.  (Id. ¶¶ 103-05).

As to the allegations regarding false and incomplete data, Krantz v. Chateau Stores of Canada Ltd., 683 N.Y.S.2d 24 (N.Y. App. Div. 1998), is directly on point.  In that case, plaintiff entered into a consulting agreement with a retail store under which the defendant agreed to pay plaintiff a bonus of 50% of the store's net profits for the year.  When defendant failed to pay the bonus, plaintiff filed a lawsuit alleging:  (1) breach of contract relating to payment of the bonus; and (2) fraud, in that defendant created a false and misleading financial statement showing that the store sustained a net loss justifying the lack of a bonus.  The Appellate Division reversed the lower court and dismissed the fraud claim as duplicative of the contract claim because the "breach of duty alleged . . . namely, the false statement of defendant's net profits, was not collateral or extraneous to the contract."  Id. at 25.  The Court additionally noted the plaintiff's failure to plead any detrimental reliance on the alleged misrepresentation.  Id.

The gravamen of this counterclaim is simply that Bravia owes Fike money based on its promise to pay her a percentage of its gross proceeds on transactions that close; as in Krantz, the counterclaim does not establish a breach of any duty separate and apart from the financial obligations subsumed in the employment contract.  Although the tenth counterclaim requests $10 million in special damages, the true nature of the alleged

25

injury relates to monies owed under the employment contract for the Avion Airways and All Nippon Airlines deals; in other words, there is no independent basis for special damages. See Sommer v. Fed. Signal Corp., 593 N.E.2d 1365, 1369 (N.Y. 1992) ("[W]here plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory."). Finally, even if the counterclaims could be strained to state a collateral obligation beyond the contract, there are no facts from which the Court can determine that Fike relied on the allegedly underreported gross profits to her detriment. Consequently, the tenth counterclaim is dismissed with prejudice as duplicative of the contract claims put forth in the first and second counterclaims.

### III.   Conclusion

Defendant's motion is denied. As the Fifth, Sixth, and Seventh counterclaims are deficiently pleaded, they are dismissed with leave to amend. The Eighth, Ninth, and Tenth counterclaims are dismissed with prejudice.

**SO ORDERED.**

**Dated:    New York, New York**
**         August 25, 2010**

**John F. Keenan**
**United States District Judge**