USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Mar. 25, 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------X
BRAVIA CAPITAL PARTNERS INC.,      :
                                   :
                    Plaintiff,     :
                                   :        No. 09 Civ. 6375 (JFK)
     -against-                     :
                                   :        **OPINION & ORDER**
MARYANNE FIKE,                     :
                                   :
                    Defendant.     :
----------------------------------X

APPEARANCES

     For Plaintiff Bravia Capital Partners Inc.:
          WILLIAM C. HOUSE

     For Defendant M:
          HERZFELD & RUBIN, P.C.
          By:  Herbert Rubin
               Maureen Doerner Fogel
               Mark A. Weissman

**JOHN F. KEENAN, United States District Judge:**

     Before the Court is Defendant Maryanne Fike's motion for
sanctions against Plaintiff Bravia Capital Partners, Inc.
Defendant claims that sanctions are appropriate because
Plaintiff committed a fraud on the court by destroying evidence,
withholding evidence, lying to the Court, and forging documents.

     She asks that the sanctions take the form of (i) dismissal
of Bravia's declaratory judgment complaint; (ii) entry of a
default judgment against Bravia on Fike's counterclaims; and
(iii) reasonable attorney's fees.  For the reasons set forth
below, Defendant's motion is denied.

However, at a later date, the Court will order Bharat Bhise, owner and CEO of Bravia, to show cause why he should not be personally sanctioned for submitting to the Court a document with an admittedly forged signature.  Additionally, hearings will be held to determine the circumstances that led to (1) the deletion of Exhibits Q, R, and PP, as well as (2) the deletion of emails during the transfer of servers on April 5, 2014.

## I. Background

Familiarity with the Court's previous decisions on this matter is presumed.  A more detailed factual background is provided in the Court's opinions resolving two motions to dismiss certain claims and counterclaims as well as the opinion resolving the cross-motions for summary judgment. See Bravia Capital Partners, Inc. v. Fike, No. 09 Civ. 6375, 2011 WL 6081345 (S.D.N.Y. Dec. 6, 2011) (motion to dismiss); Bravia Capital Partners, Inc. v. Fike, No. 09 Civ. 6375, 2011 WL 4632891 (S.D.N.Y. Oct. 5, 2011) (summary judgment); Bravia Capital Partners, Inc. v. Fike, No. 09 Civ. 6375, 2010 WL 3359470 (S.D.N.Y. Aug. 25, 2010) (motion to dismiss).  The Court sets forth the facts relevant to this motion below.

Bravia, a New York corporation engaged in the aviation finance business, hired Fike as an independent contractor to help bring in new business.  Bravia memorialized the parties' agreement in a one-page letter to Fike on December 14, 2006.

According to that letter, Fike was entitled to certain percentages of the gross fees for "any transactions that close." For in-house deals that Fike worked on, she would receive 5 percent of the gross fees.  For new clients that she brought in, she would receive compensation based on three tiers:  10 percent of the first $500,000 of gross fees; 15 percent of the next $500,000 up to $1 million of the gross fees; and 20 percent of gross fees in excess of $1 million.  Bravia fired Fike on February 27, 2009.

In June 2009, Bravia brought this declaratory judgment action against Fike in New York state court, seeking a declaration that it does not owe her commissions related to various deals.  Fike removed the action to this Court on the basis of diversity and counter-claimed for a money judgment on those same deals.

After a stipulation, two motions to dismiss, and cross-motions for partial summary judgment, there are four counterclaims remaining.  Bravia had moved for summary judgment on two of those counterclaims, but shortly before oral argument Fike alerted the Court that she intended to move for sanctions. The Court ordered the summary judgment motion be deemed withdrawn until the resolution of the sanctions motion. (ECF No. 218.)

This motion involves two disputed deals:  the so-called ANA-Mitsubishi Deal and the Avion Deal.  In the ANA-Mitsubishi Deal, Bravia acted as an agent for an existing client, HNA Group Company Limited ("HNA Group" or "HNA"), in the forward purchase of three leased aircraft from All Nippon Airways ("ANA").  In broad strokes, the deal involved (a) a sale and leaseback agreement and (b) a forward purchase.  For the first part, ANA sold three old airplanes to a Mitsubishi subsidiary called MCAP Japan 101 Limited ("MCAP"); MCAP would then pay rent to ANA.  In the second part of the deal, the aircraft would be converted to freighter configurations and delivered to BHK Partners 1 Limited, an HNA Group special purpose vehicle based in the Cayman Islands.

The parties dispute the amount of fees earned by Bravia on this deal.  This dispute arises from the fact that there are at least two drafts of the agreement between HNA Group and Bravia. The one that Bravia claims is the true agreement was allegedly signed by Bravia's CEO, Bharat Bhise, in India and is for approximately $1.5 million in fees ("$1.5 Million Fee Agreement").  Fike claims that the real agreement was signed by Robin Yan, then the manager of planning for Bravia, and is for $3 million in fees for Bravia along with $1 million to what is called the Japanese Agent ("$4 Million Fee Agreement").  Fike says she is entitled to a percentage of all $4 million in fees

4

provided for in the $4 Million Fee Agreement.  Bravia claims
that the agreement Yan signed was an early draft and that Yan
did not have authority to sign the agreement on behalf of
Bravia.

For the Avion Deal, Bravia acted as an agent for an
existing client in the acquisition of two aircraft from Avion
Aircraft Trading hf ("Avion"), an Icelandic company.  Bravia
claims that its gross profit from the Avion transaction was
$188,000.  Fike alleges that Bravia actually made at least
$400,000 in fees.  Like the ANA-Mitsubishi Deal, this dispute is
also fueled by the existence of two separate agreements.

In support of her motion for sanctions, Fike deposed Liu
Hui Feng ("Liu" or "Liu Feng"), who worked for HNA Group as a
manager in its purchasing management department.  Liu acted as a
liaison between HNA and Bravia during the ANA-Mitsubishi Deal.
(Liu Tr. 13.)  At his deposition, Liu provided copies of emails
that he sent to and received from Bravia employees ("Liu
Emails").  These emails concerned the ANA-Mitsubishi Deal and
the creation of the agreement that would become the $4 Million
Fee Agreement.  Several of these emails were never produced by
Bravia during discovery.  Bravia also took the deposition of Ren
Wei Dong from HNA Group.

After each side deposed Liu and Ren Wei Dong, Fike moved
for sanctions.  Fike alleges that Bravia perpetrated a fraud on

this Court because (1) Bravia "deliberately concealed" relevant evidence and (2) several of Bravia's witnesses, including Bhise, "repeatedly lied to Fike and to the Court." (Def. Mem. 1)  Fike seeks entry of a default judgment against Bravia and an award of attorneys' fees and costs.

During oral argument, Plaintiff referenced additional documents that had not been produced to Defendant, including the transaction ledger for BHK Partners 1 Limited, which the parties agree is a New York company separate from HNA Group's off-shore special purpose vehicle of the same name. (Tr. 30-31.)  The Court ordered Plaintiff to produce these documents. (Tr. 31.)  Plaintiff emailed copies of the documents ("Supplemental Documents") to chambers along with explanations of each document.  Defendant objected to the documents submitted in addition to the ledger as well as the explanations.

In light of the newly submitted documents, as well as Defendant's objections, the Court ordered Plaintiff to authenticate the new documents and set a briefing schedule concerning the appropriateness of sanctions for failing to produce the Supplemental Documents sooner.

## II. Discussion

### A. Legal Standard

A Court has the inherent authority to sanction a party for committing a fraud on the court.[1] See In re Dynex Capital, Inc. Sec. Litig., No. 05 Civ. 1897, 2011 WL 2581755, at *3 (S.D.N.Y. Apr. 29, 2011).  A party commits a fraud on the court when it has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by . . . unfairly hampering the presentation of the opposing party's claim or defense." Passlogix, Inc. v. 2FA Tech., LLC, 708 F. Supp. 2d 378, 393 (S.D.N.Y. 2010) (alteration in original) (internal quotation marks omitted).  The existence of the fraud on the court must be "established by clear and convincing evidence." Id.

The archetypical fraud on the court occurs "when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process." McMunn v. Mem'l Sloan–Kettering Cancer Ctr., 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002).  Other examples of actions that can rise to the level of fraud on the court include where a party

---

[1] Defendant also alludes to Rules 11 and 37 of the Federal Rules of Civil Procedure, but does not specifically point to Plaintiff's pleadings or a discovery order that the Plaintiff failed to obey.  Nor does she sufficiently advance an argument to show that such sanctions would be appropriate.  The Court's analysis is thus limited to its inherent powers.

"(1) improperly influences the trier; (2) unfairly hampers the presentation of the opposing party's claim or defense; . . . or (4) knowingly submits fraudulent documents to the Court." Passlogix, 708 F. Supp. 2d at 395 (alterations, citations, and internal quotation marks omitted).

If a party's actions rise to the level of a fraud on the court, there are a number of sanctions available including a jury charge, awarding attorney's fees, and entry of default judgment against the offending party. See R.F.M.A.S., Inc. v. So, 271 F.R.D. 13, 22 (S.D.N.Y. 2010).   Entering judgment against the offender, however, "is permissible only when the deception relates to matters in controversy in the action, and even then is so harsh a remedy that it should be imposed only in the most extreme circumstances." Sanchez v. Litzenberger, No. 09 Civ. 7207, 2011 WL 672413, at *5 (S.D.N.Y. Feb. 24, 2011) (internal quotation marks and citation omitted).   In considering so drastic a remedy, the court weighs "(1) whether the misconduct was the product of intentional bad faith; (2) whether and to what extent the misconduct prejudiced the other party; (3) whether there is a pattern of misbehavior, rather than an isolated instance; (4) whether and when the misconduct was corrected; and (5) whether further misconduct is likely to continue in the future." McMunn, 191 F. Supp. 2d at 446.

## B. Analysis

Fike premises her motion on (1) "Bravia's failure to produce highly relevant documents." (Def. Mem. 17.); and (2) what she characterizes as the lies of several Bravia witnesses, including the submission of allegedly forged or improperly altered documents.  Therefore, in evaluating whether sanctions are appropriate, the Court will take each allegation in turn.

First, the Court will look at whether Bravia wrongfully deleted or withheld documents.  As later explained, the Court will subject the Liu Emails to a spoliation analysis.  However, the Supplemental Documents will be evaluated to see if Plaintiff failed to produce them in response to Defendant's demands for documents.  Second, the Court will evaluate the allegedly false statements by Bravia's witnesses.  Next, the Court will examine the allegedly forged ANA-Mitsubishi agreement and altered revenue journal.  Finally, the Court will determine whether, taken together, Bravia's conduct rises to the level of a fraud on the Court.

### 1. Spoliation of the Liu Emails

As an initial matter, Fike has not established that any of the documents she provided were withheld during discovery. Indeed, she offers no evidence and advances no argument that Bravia had possession of the documents at the time they should

9

have been produced.  Bravia alleges that the documents were
deleted in the normal course. (Bhise Decl. ¶¶ 3–10; Yan Decl. ¶¶
6–13.)  Thus, the Court interprets Fike's argument as one for a
finding of spoliation.

     In order to prove spoliation, Fike must show that
(1) Bravia had a duty to preserve the emails; (2) Bravia had a
culpable state of mind when the emails were destroyed; and
(3) the emails were relevant. See Zubulake v. UBS Warburg LLC,
229 F.R.D. 422, 430 (S.D.N.Y. 2004).  A party may still be
sanctioned for spoliation even though, as here, its adversary
comes to possess the documents. See Nursing Home Pension Fund v.
Oracle Corp., 254 F.R.D. 559, 565 (N.D. Cal. 2008).

     Fike nowhere cites the standard for spoliation.  It is
perhaps not surprising then that she made no showing of when a
duty to preserve attached or that destruction occurred with a
culpable state of mind.  Indeed, only three of the Liu Emails
appear even remotely covered by the spoliation standard.

     The latest that the duty to preserve would have attached is
June 29, 2009, which is the date Plaintiff's counsel signed the
verified complaint for declaratory judgment filed in state
court. See Arista Records LLC v. Usenet.com, Inc., 608 F. Supp.
2d 409, 430 (S.D.N.Y. 2009) ("In the usual case the duty to
preserve evidence arises no later than on the date the action is
initiated.")  Of course, the duty to preserve does not begin

only at the moment of filing the complaint, and may attach "when a party should have known that the evidence may be relevant to future litigation." See In re WRT Energy Sec. Litig., 246 F.R.D. 185, 195 (S.D.N.Y. 2007) (internal quotation marks omitted). Although Defendant does not take this position, the earliest the duty would have attached is February 27, 2009 — the date of Fike's termination.

All but three of the allegedly spoliated emails can be dispensed with quickly.  Most of the emails are from December 2007, more than a year and a half before any duty would have arisen. (Exs. C-K.)  Five are from late March or April 2008, more than a year before the litigation and nearly a year before Fike's firing. (Exs. L-O, U.)  One is from March 2009, four months before the start of litigation and a month after Bravia terminated Fike. (Ex. P.)

Since Fike, who bears the burden, presents no evidence to suggest that the duty to preserve arose before the litigation, the Court finds that Defendant had no duty to preserve the above referenced emails.  Therefore, none of these emails can serve as the basis for a finding of spoliation.

Fike provides five emails that post-date the litigation. (Exs. Q-T, PP.)  However, Bravia actually produced one of those, Exhibit S.  Another, Exhibit T, was not sent to anyone from Bravia, and was thus never in Bravia's possession. (Pl. Mem. 13;

Def. Mem. 9 (referring to Exhibit T as an "internal HNA email.").)  Neither could be grounds for spoliation.

That leaves three possibly spoliated emails.  The first, Exhibit Q, was sent by Robin Yan on July 28, 2009, and transmits what the parties call the Edogawa Side Letter with the phrase "FYI see below the original signed documents between BHK and the Japanese Agent." (Ex. Q.)

The second email, Exhibit R, sent in January 2011, contains a table that relates to the ANA-Mitsubishi Deal.  The series of emails themselves, however, do not clearly refer to the ANA-Mitsubishi Deal.  The subject line reads "payment schedule of P2F program for 3 747." (Ex. R.)  There are references to "CDB" and "CDBL" but not HNA Group, Mitsubishi, MCAP, BHK Partners 1 Limited, or ANA.  The table is sent by Liu Feng to Yan with a request for a "payment schedule like the following matrix of purchasing program." (Id.)

In reply, Fike provided Exhibit PP, which is a series of emails from January 2011.  The subject of the email is "Payment of the 2nd aircraft." (Ex. PP.)  It appears from the text of the emails that they are concerning the ANA-Mitsubishi Deal.  For example, one of the emails in the chain specifically references Mitsubishi.  At least three reference MCAP, while another references HNA Group and uses the serial number of one of the three planes.

12

Since Defendant only presented Exhibit PP in reply, Plaintiff did not initially have an opportunity to address it. The Court thus raised the issue at oral argument. (Tr. 24.) Plaintiff conceded at oral argument that the email was relevant to the ANA-Mitsubishi deal. (Tr. 24.)  Plaintiff then averred that the email chain was not turned over or preserved because Bravia's employees "didn't use the right [search] terms." (Tr. 26.)

It is clear that Plaintiff deleted each of these three emails — Exhibits Q, R, and PP — after the duty to preserve arose because they were all sent after the litigation began. Since there was no intervening act of God or other circumstance beyond Plaintiff's control, the destruction of the emails was at a minimum negligent. See Zubulake, 220 F.R.D. at 220.  Thus, Plaintiff acted with a culpable state of mind.[2] See Dorchester Fin. Holdings Corp. v. Banco BRJ S.A., --- F.R.D. ----, 2014 WL 7051380 (S.D.N.Y. 2014) ("[A] 'culpable state of mind' requires at least negligence."). Defendant made no showing that Plaintiff acted grossly negligent, recklessly, or intentionally. Therefore, the Court will not engage in line drawing except to

---

[2] The Court notes that there is a proposed amendment to Fed. R. Civ. P. 37(e) that would reject the Second Circuit standard of mere negligence and require a showing of bad faith.  The proposed amendment, if adopted, would not go into effect until at least December 2015.  As such, and because neither party raised the issue, the Court will continue to use the Second Circuit standard. See also Hawley v. Mphasis Corp., 302 F.R.D. 37, 47 n.4 (S.D.N.Y. 2014); Sekisui Am. Corp. v. Hart, 945 F. Supp. 2d 494, 503 n.51 (S.D.N.Y. 2013).

note that it cannot infer intent from the text of the emails, and the text of Exhibits Q and R weigh against a finding of intentional deletion.

More specifically, although Exhibit Q was destroyed, Bravia has produced the Edogawa Side Letter attached to the email. Moreover, Bravia took the position that documents pertaining to R.F. Edogawa Aerospace LLC ("Edogawa Aerospace") were not discoverable up until mid-2012 when Fike made a motion to compel and Magistrate Fox resolved the dispute in a telephone conference on October 23, 2012. (ECF notation on Oct. 23, 2012) It is thus perhaps not surprising that an email concerning Edogawa Aerospace sent not more than a month after this case began could have been negligently deleted.

Nor can the Court infer intent from the face of Exhibit R. Those emails do not refer directly to the ANA-Mitsubishi Deal, and the table concerning the ANA-Mitsubishi Deal was sent by Liu Feng.  Moreover, the table does not appear to be clearly labeled as relating to the ANA-Mitsubishi Deal, with the serial numbers for the aircrafts being the only identifying characteristic. While this email should have been preserved, it is not hard to imagine someone negligently deleting an email that is not readily identifiable as related to the ANA-Mitsubishi Deal.

Turning to the question of relevance, the Court need not imagine the content of the emails, since unlike the typical case

14

of spoliation, Defendant has actually obtained the emails
deleted by her adversary.  Relevance here is more than probative
value under Federal Rule of Evidence 401.  See Residential
Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 108-09 (2d
Cir. 2002).  Instead, relevance turns on whether the destroyed
emails would have been or, in this case, are, "favorable" to
Defendant's case.  Toussie v. Cnty. of Suffolk, No. 01 Civ. 6716,
2007 WL 4565160, at *8 (E.D.N.Y. Dec. 21, 2007).

     The Court notes that it is not yet clear that Fike is
entitled to any commissions on the ANA-Mitsubishi Deal.  See
Bravia, 2011 WL 4632891, at *5 ("[F]actual disputes remain as to
the amount of work Fike expended with respect to the ANA[-
Mitsubishi] Deal.")  Thus, the dispute over which agreement
controlled and the amount of fees Bravia collected would be
irrelevant if Fike did not perform sufficient work to entitle
her to those fees.

     Of course, that does not mean the destroyed evidence would
not be "favorable" to her case.  See Passlogix, 708 F. Supp. 2d
at 411 ("A discarded document is relevant where a reasonable
trier of fact could find that the document either would harm the
spoliator's case or support the innocent party's case.").  Since
it uses the term "Japanese Agent" and transmits the Edogawa Side
Letter, Exhibit Q lends support to Fike's theory, discussed in
more detail below, that Edogawa Aerospace is the Japanese Agent

referred to in the $4 Million Fee Agreement.  Similarly, the table included in Exhibit R contains agent fees consistent with the $4 Million Fee Agreement, bolstering her case for that agreement representing the true final agreement.  Finally, the emails in Exhibit PP reflect $333,000 invoices for agent fee payments to BHK Partners and demonstrate HNA's apparent confusion about whether that amount should be paid directly to Bravia instead.  That would corroborate her claim that the $333,000 fees correspond to those in the $4 Million Fee Agreement.  Since each email is relevant, the Court finds that Bravia spoliated the emails attached as Exhibits Q, R, and PP.

Fike does not seek a separate sanction for spoliation, rather she characterizes the deleted emails as part of a broader fraud on the court.  Because the Court concludes that Fike has not established that Bravia committed a fraud on the court, it is left to fashion a remedy for the spoliation of the three exhibits.  See In re NTL, Inc. Sec. Litig., 244 F.R.D. 179, 192 (S.D.N.Y. 2007) ("The sanctions imposed should serve the threefold purposes of deterring parties from engaging in spoliation, placing the risk of an erroneous judgment on the party who wrongfully created the risk, and restoring the prejudiced party to the position it would have been in had the misconduct not occurred." (internal quotation marks omitted)).

The Court will defer sanctioning until the parties have an opportunity to fully brief the issues of culpability, prejudice to Fike, and an appropriate remedy for the spoliation of these three emails.  As part of its consideration of culpability, the Court will hold a hearing to ascertain why these emails, in particular Exhibit PP, were not turned over to Fike and the manner in which they were ultimately deleted.  The Court will discuss the timing of the hearing and briefing at the next conference.

Fike also argues that Bravia should be sanctioned for the destruction of "relevant" emails on April 5, 2014.  However, she advances no argument to support this claim.  And although she characterizes it as the destruction of "any" remaining evidence, that mischaracterizes Bravia's representation to the Court at oral argument.  There, counsel informed the Court that "numerous people connected with the company" lost data when Bravia switched email servers. (Tr. 26.)  Gao, in particular, lost all emails from 2010. (Id.)  Although Bravia would have had a duty to preserve those emails, Fike does not argue and thus has not shown that Bravia (1) had a culpable state of mind; and, more importantly, (2) destroyed "relevant" information. See Orbit One Commc'ns, Inc. v. Numerex Corp., 271 F.R.D. 429, 439 (S.D.N.Y. 2010) ("In the absence of bad faith or other sufficiently egregious conduct,  it cannot be inferred from the conduct of

the spoliator that the evidence would even have been harmful to
him." (internal quotation marks omitted)).

The Court is, however, troubled by the apparently mass
deletion of emails during what has been contentious litigation.
As Fike points out, Bravia switched servers during the briefing
of the sanctions motion.  The Court therefore believes a hearing
would be appropriate to ascertain what steps, if any, were taken
to preserve the emails during the switch of servers.  A
determination will then be made as to whether spoliation
occurred and, if so, what sanction would be appropriate.  The
timing of the hearing will be discussed at the next conference.

### 2. Failure to Produce the Supplemental Documents in Response to Demands for Discovery

The Court now turns to the Supplemental Documents, which
Bravia had not previously turned over to Defendant.  Fike argues
that these documents were responsive to three of her demands for
documents.  The Court will therefore evaluate whether Plaintiff
should have produced these documents in response to those
demands.

In answering the Court's question during oral argument
about Exhibit PP, Plaintiff's counsel also clarified that the
email concerned fees for conversion of the second aircraft.
Counsel explained that the email

> refers to payments that are to be made by CDBL
> Leasing Co., which is a Chinese financial

institution standalone leasing arm of China
Development Bank, and the payments were to be made
as a result of a transaction between HNA [G]roup
and CDBL that took place in 2009, a transaction as
to which Bravia was not a party at all, has no role
in structuring or arranging, did not know the
terms.  These documents were documents that were
requested by HNA for satisfaction of requirements
in its agreement with CDBL.

(Tr. 25.)  He also offered to produce an email dated November

13, 2011 that concerned the first aircraft, which would help

explain why Exhibit PP was not produced. (Id.)  Plaintiff

produced that email as part of its supplement to the Court.

(Yan. Supp. Decl. Ex. 1.)

   That email includes two attachments:  (1) an invoice dated

October 27, 2010 from 747-Freighter Conversion, LLC to CDB

Leasing Co., Ltd. for a conversion payment for the first

aircraft; and (2) an invoice dated November 3, 2010, from BHK

Partners 1 Limited to CDB Leasing Co., Ltd. for a payment upon

final delivery and agent fees related to the acquisition of the

first aircraft.

   Plaintiff also produced three additional invoices.  The

first is dated January 3, 2011 and was sent as an attachment to

the email in Exhibit PP. (Gao Supp. Decl. Ex. 1.)  It is from

BHK Partners 1 Limited to CDB Leasing Co., Ltd. for agent fees

related to the second aircraft.  The second is dated April 26,

2011 and is from BHK Partners 1 Limited to CDB Leasing Co., Ltd.

for agent fees related to the third aircraft. (Id. Ex. 2.)

Exhibit 3 appears to be an inadvertent duplicate of Exhibit 2, as the declaration introducing Exhibit 3 describes a completely different document. (Gao Supp. Decl. ¶ 10.)  The description does, however, match another invoice, labeled as "4-21-11 MCAP Japan01 to BK invoice for Purchase Price of 25641.pdf," that Plaintiff emailed to the Court after oral argument, and the Court concludes that the declaration authenticates this document and will refer to this invoice as Exhibit 3 of the Gao Supplemental Declaration.  This invoice is dated April 22, 2011 and is from MCAP to BHK Partners 1 Limited and CDB Leasing Co., Ltd. for the balance of the purchase price for the third aircraft.

Defendant claims that each of these documents should have been produced in response to three separate document requests: (1) Request 4a in Fike's Second Demand for Documents served on April 1, 2010; (2) Request 8 in Fike's Third Demand for Production of Documents served on February 5, 2012; and (3) Request 11 from the Third Demand.  Neither request compelled the production of the supplemental documents.

Request 4 demands:

All accounting records, ledgers, bank statements showing monies paid to Bravia pursuant to its agreement with HNA Group Co., ltd (See Bates BCP0003816-0003820) including, but not limited to $75,000, $925,000, $1,000,000 and $333,333 for each aircraft.

(Rubin Supp. Dec. Ex. UU.)  Defendant emphasizes the "$333,333

for each aircraft."  But the Court agrees with Plaintiff that

the more important part of the demand is "to Bravia."  None of

the Supplemental Documents show payments "to Bravia," instead

showing demands for payment by 747-Freighter Conversion, LLC;

BHK Partners 1 Limited; and MCAP Japan01 Limited.

> Request 8 seeks:
>
> Documents, books, financial records, notes,
> memoranda, correspondence and e-mails relating to
> the receipt, payment and/or transfer of funds, in
> any manner, with connection to the ANA aircraft by
> Bravia, RF Edogawa Aerospace LLC, BHK Partners 1
> Limited and/or Yangtze River.

(Rubin Supp. Dec. Ex. VV.)  Request 11 is similar:

> Documents, books, financial records, notes,
> memoranda, correspondence and emails reflecting
> payments to Bravia and/or its affiliated companies
> concerning the financing, leasing, management
> services, conversion management services and/or
> other services in connection with the ANA aircraft.

(Rubin Supp. Dec. Ex. VV.)

Several reasons convince the Court that Bravia did not have

to produce the Supplemental Documents in response to Fike's

three demands.  First, Exhibit 3 of the Gao Supplemental

Declaration is a demand for payment from MCAP.  Although it

demands payment from BHK Partners 1 Limited, the invoice can in

no way be construed as reflecting a payment to BHK Partners 1

Limited.  Second, the emails and invoices do not "reflect

payments to" anyone, nor do they reflect "the receipt, payment

21

and/or transfer of funds." They are demands for payments and do not show that any payments were actually made, received, or transferred.

The Court is also not convinced that Request 8's reference to BHK Partners 1 Limited is to the same company to which the newly produced revenue journal belongs. The parties agree that there are two companies with identical names: (1) BHK Partners 1 Limited,[3] a New York company; and (2) BHK Partners 1 Limited, a Cayman Islands company. The parties also agree that the revenue journal is for the New York company.

As Defendant acknowledged in her Memorandum of Law in Opposition to Plaintiff's and Non-party Movants' Motions to Limit Discovery (ECF No. 115), the New York BHK Partners 1 Limited's "existence only suddenly came to light on April 25, 2012." (Id. at 2). Both of Defendant's demands for documents were served before that date, with the latest being on February 5, 2012. Thus, at the time the demands were served, they could have only been referring to the Grand Cayman BHK Partners 1 Limited. Frustrating as it might be for Defendant, the Court cannot conclude that Plaintiff failed to provide documents for a

---

[3] Plaintiff alleges that the New York company is actually called BHK Partners 1 Limited, Inc., but the New York Secretary of State lists the only company with "BHK Partners" in its name as "BHK Partners 1 Limited."

company when the demand was understood as one for a different company with the same name.

Moreover, even if the documents were responsive, Fike has not established that Bravia had "possession, custody, or control" over the New York BHK Partners 1 Limited's revenue journal, such that it was even required to produce it in response to her demands.  BHK Partners 1 Limited and Bravia are distinct entities.  The Court rejects Fike's argument that Bhise had a separate duty to produce the documents because BHK Partners 1 Limited is his alter ego.  She has not alleged, much less established, the elements that would allow the Court to conclude that there is such an alter ego relationship.

The Court thus concludes that Fike has not established that Bravia failed to produce these documents in response to her demands for discovery.  No sanction is therefore required.

### 3. Perjury

Fike accuses Bravia of what can only be described as a coordinated effort by several of its key witnesses to repeatedly lie to her, Bravia's business associates, and this Court.  If established, Bravia would have effected a massive fraud through the systematic perjury of its witnesses.

Fike's claim that Bravia's witnesses repeatedly lied to the Court is broadly based on her assertions that (1) the $4 Million Fee Agreement is the true final agreement, and (2) Bravia and

its witnesses have "falsely denie[d]" it. (Def. Mem. 11.)  In the cases Fike cites to support her "fraud on the court" argument, the perpetrators had been caught in obvious lies that were contradicted by independent records, video tape, or undisputed facts. See Scholastic, Inc. v. Stouffer, 221 F. Supp. 2d 425, 440-445 (S.D.N.Y. 2002) (finding of sanctions based largely on undisputed facts); McMunn, 191 F. Supp. 2d at 446-60 (plaintiff confronted with credit statements and videotape that refuted her prior statements); Skywark v. Isaacson, No. 96 Civ. 2815, 1999 WL 1489038, at *6-8 (S.D.N.Y. Oct. 14, 1999) (new evidence confirmed that plaintiff had in fact been in accidents and performed renovations on his home).  While Fike also makes more specific claims of falsehoods, discussed below, the Court will first address the $4 Million Fee Agreement and the evidence that tends to show that Bravia acknowledges it as the actual governing agreement.

There is no question that the new evidence serves to undercut Bravia's long-held claim that the $1.5 Million Fee Agreement is the operative agreement.  But the evidence is insufficient for the Court to conclude, at this time, that the $4 Million Fee Agreement controls and that Bravia and its witnesses have lied about it.

Although there are now several emails showing the evolution of the $4 Million Fee Agreement in December 2007, they do not

24

necessarily contradict Bhise's testimony that the $4 Million Fee Agreement was an earlier draft of the $1.5 Million Fee Agreement he signed in India.  While Bhise has described it as a "first" draft, it does not appear from the emails that he was involved with the back-and-forth edits, although he was copied on the email chain.  The actual first draft was emailed on December 19, 2007, when Bhise was in India. (Bhise Decl. ¶ 17.)

There are other particular pieces of evidence that come close to establishing that Bravia's account may be false. Exhibit O is an April 3, 2008 email from Bhise that has $4 million listed as fees.  However, while this weakens Bravia's description, the fact that it does not explain the breakdown of the fees or to whom the fees will be paid inhibits the Court from concluding that Bhise is referring to the same fees from the $4 Million Fee Agreement.

Exhibit PP also approaches the line of establishing false testimony.  In the email thread, Gao attaches an invoice for "Payment to BHK partners 1 for US$ 333K." (Ex. PP.)  Tony Cui from HNA Group then expresses confusion about the $333,333 agent fee:  "the invoice you had provided is issued by BHK, but according to the Lease Agreement it should be paid directly to BCP, if BCP request the fund to be paid to BHK, then we need something to show CDBL that the Agent Fee has been paid by BHK to BCP." (Id.)  This would tend to support Fike's contention

that HNA Group believed the $4 Million Fee Agreement was the genuine agreement.  However, no one from Bravia confirms Cui's understanding of the agreement.  Furthermore, it is not even clear that the Lease Agreement referred to in the email is the $4 Million Fee Agreement or the $1.5 Million Fee Agreement.

The Court is also concerned with the charts showing the payment schedules that are included in several of the emails. (Ex. P, R, T, PP.)  These charts contain references to payments that closely mirror the $4 Million Fee Agreement.  However, the agents listed on the chart, "Agent 1" and "Agent 2," are not identified by anyone at Bravia, with only Liu Feng identifying Agent 1 as "agent for (3) airplane selling" and Agent 2 as Bravia in an email that was not sent to anyone at Bravia. (Ex. T.)  It is thus unclear to the Court how Bravia interpreted "Agent 1" and "Agent 2," or what significance anyone at Bravia gave the charts, which appear to have been originally produced by Liu Feng. (Ex. P.)

Based on the foregoing, the Court cannot conclude at this time that the $4 Million Fee Agreement is the final agreement between the parties or that Bravia, through its witnesses, lied about it.  While the new evidence damages Bravia's case and serves to weaken the credibility of its witnesses, the Court is not convinced that the $1.5 Million Fee Agreement is necessarily an outright lie.

The Court now turns to Fike's specific allegations of false testimony.  Fike's first specific allegation of perjury is that Bhise falsely denied that the $4 Million Fee Agreement is the true agreement.  However farfetched Bhise's story might seem, it has remained consistent, and Fike has not yet established that it is false.  Bhise claims that the $4 Million Fee Agreement was signed by Yan without authority and without Bhise's knowledge. There is nothing in the provided emails that prove that false. Although Bhise is copied on many of the emails, he claims that he did not read them and was unaware that Yan signed the agreement until after Bhise executed the $1.5 Million Fee Agreement.  While that explanation certainly comes off as self-serving, there are no responses from Bhise demonstrating that he actually read the emails transmitting the drafts.

Fike next argues that Bravia continued to rely on the $4 Million Fee Agreement and referenced it in later emails. (Rubin Decl. Ex O.)  In Exhibit O, Bravia lists $4 million as "fees" in an email to HNA Group relating to the ANA-Mitsubishi Deal. However, there is no indication in the email to whom the fees are to be paid.  Bhise claims that someone (unidentified) at HNA "suggested increasing the amount carried as fees by another $1.5 million as a means to create some liquidity.  That would result in increased liquidity, of course, only if the amount was not actually going to someone as fees." (Bhise Decl. ¶ 68)  He goes

on to claim that the $4 million in fees referenced in Exhibit O
are "the amounts due under the Agency Agreement, the BHK-Edogawa
agreement and an amount that was to provide a liquidity facility
of $1.5 million as a source for partial payment of what was
due." (Bhise Decl. ¶ 70.)  As discussed above, the vague
reference to "fees" is not enough to show that the fees were the
same as those in the $4 Million Fee Agreement.  Again, Bhise's
explanation can be read as a convenient after-the-fact account,
but the Court is not yet convinced that it is false.

Fike's third allegation is that the new emails show that
Bhise, and not HNA, proposed paying the $3 million fee to Bravia
and the $1 million fee to the so-called Japanese Agent.  Fike
alleges that "Bhise lied when he told this Court that HNA
proposed the $3 million fee for the ANA deal to Bravia." (Reply
Mem. 7.)  To support this argument, Fike cites to a portion of
Bhise's transcript:

> Q. Well, did you suggest that amount and they said, that's
> too much or that's too little?
> A. Well, I had suggested $2 million.  And then we
> eventually settled at 1.5 or whatever the number was, close
> to 1.5, because there was [sic] expenses and whatnot.

(Bhise 210-11)  Nothing about the cited portion of the
transcript deals with HNA Group proposing $3 million in fees.
Later on in Bhise's deposition, he says:

> They [HNA] told me that there was 1.5 million that they
> wanted me to transfer to somebody else that they could get

28

out on this transaction, and I said, I would not like it as part of the same deal, it should be separate, and I was not comfortable with doing that. And then they said, okay.  And I said, we'll make a different arrangement for the other 1.5 million.

(Bhise Tr. 215.)  This is consistent with his 2010 Declaration:

[The $4 Million Fee Agreement] provides for payment of gross fees in the amount of $3,000,000.  That sum, however, was more than twice the amount we had discussed in fees for plaintiff.  It included $1,462,500 in funds that I was asked to hold and spend on request at future times for expenses for the benefit of the principals.  As I was unwilling to include such amounts in the agreement setting out plaintiff's fees, the letter agreement as drafted was unacceptable.

(Bhise 2010 Decl. ¶ 33.)  As far as the Court can tell, Bhise's testimony is that he suggested, and HNA Group rejected, a bid for more than $2 million in fees.  HNA later tried to get Bhise to sign an agreement for $3 million that would have included an additional $1.5 million that Bhise would have to transfer to somebody else, which Bhise rejected.  This testimony is weakened by Bhise's December 17, 2007 email at Exhibit C, where he includes a chart with fees to Bravia totaling $3 million.  However, beyond Bhise testifying that negotiations likely took place after December 16, 2007, the sequencing of events is still unclear.  Thus, the Court cannot conclude that he lied when giving this testimony.

Fike next argues that "Yan lied when he claimed that he had never seen the agreement." (Def. Mem. 4).  She claims that Robin

Yan did not inadvertently sign the $4 Million Fee Agreement; rather, he was intimately involved with the negotiations and even edited the draft and asked Liu to initial it.  When Yan was asked if he had ever seen the agreement during his February 2013 deposition his response was "Not that I recall." (Yan 2013 Tr. 86.)  He also later said that he recalled seeing it when he wrote his affidavit but "I don't believe I saw it before then." (Id. at 89.)  Although he admits signing the agreement, "he could have only seen the signature page." (Id. at 90.)

The new emails show that Yan was certainly involved in emailing back and forth drafts of the agreement. (Exs. E–K.) Indeed, he also made edits to the document.  However, none of the emails appear to evidence Yan's understanding of the agreement.  In one email he admits to making "cosmetic" changes and adding a merger clause at the end of the agreement. (Ex. J.) The cosmetic changes include adjusting spaces, deleting periods, and adding a date to the agreement.  Yan also directs Liu to initial each page "LHF."  It's not clear to the Court that any of those changes would require Yan to actually read or understand the document, which would suggest that his testimony was false.

Defendant also claims that Yan "perjured himself by disclaiming any knowledge of the fees for the ANA-Mitsubishi deal." (Def. Mem. 17.)  It is true that Yan testified that he

did not know who drafted the agreement, did not recall seeing
the document before he signed his affidavit, did not recall who
sent it to him, and did not recall how he came to sign it. (Yan
Tr. 89-91.)  He also did not recall preparing the document. (Id.
at 104.)  Yan said that he did not know what the letters "LHF"
stood for on the $4 Million Fee Agreement and that he did not
recall anyone at HNA with those initials. (Id. at 103.)

Fike characterizes this as "severe but improbable memory
loss." (Mem. 17.)  There are only seven emails in question that
were sent over the course of ten days back in December 2007.
Fike deposed Yan in February 2013, a little more than five years
after he sent those emails.  It does not seem severe or
improbable for Yan to be unable to recall specifics of email
chains that happened five years ago, particularly if one credits
his explanation that he completely misunderstood the nature of
the agreement and merely acted as a liaison.  While this new
evidence serves to undermine his deposition testimony, it does
not establish that he lied under oath.

Fike also says that Bravia "added the 'clarification' that
a total of $3,000,000 will be paid by HNA to BCP as Fees." (Def.
Mem. 8.)  But Liu's testimony is that "Bravia recommended that,"
not that they added it to the agreement. (Liu Tr. 62.)  There
were also no follow-up questions as to who from Bravia
recommended it or when it was recommended.  Moreover, it appears

to the Court that Bravia's edits are marked in blue and that the
HNA edits are red. (Ex. G.)  The part about the "clarification"
appears to be in an orange font.  But no effort was made to have
Liu explain what any of the colors mean, it is unclear what the
edits actually reflect.  In another email, Liu says that HNA
accepts "all the terms which have been modified by BCP." (Decl.
Ex. H.)  Again there is no explanation of what terms Bravia
modified.  Given these ambiguities, it is not clear to the Court
that Bravia added the clarification to the $4 Million Fee
Agreement.  Furthermore, even if someone at Bravia had added the
clarification, that would not necessarily be inconsistent with
Bravia's explanation about there being two separate versions of
the agreement or that the $4 Million Fee Agreement was an
earlier draft.

       Fike next argues that "Bravia claims that [Rasik] Chopra
told Yan to sign the agreement, and Yan did as he was
instructed." (Reply Mem. 11 citing Bhise Declaration.)  However,
Bhise's Declaration states:

       I made a quick call to the New York offices, and asked what
       that [signing of $4 Million Fee Agreement] was about.  He
       [Yan] told me that a letter agreement had come, he had been
       told to sign it by Rasik Chopra, and so he did.  I told him
       that was the wrong agreement, and that, in any case he did
       not have authority to sign any agreement on behalf of the
       company.

(Bhise Decl. 47.)  It is not clear from this statement, however,
what Chopra or Yan knew about the agreement.  While Fike's

characterization – that Chopra reviewed the agreement and told

Yan to sign that specific agreement – is possible, it is also

plausible that, as Yan has testified, he was confused by

Chopra's direction to sign a different agreement and instead

signed the $4 Million Fee Agreement by accident.   Consider Yan's

previous testimony:

> On or about December 26, 2007, I was instructed by Mr.
> Chopra to sign his name to the notice BCP was giving of
> the assignment of its interests to BHK Partners.  I did
> so. . . .

(Yan 2011 Tr. ¶¶ 14-16.)  Similarly, he previously declared:

> On the same day I also signed the document attached as
> Exhibit G to this affidavit [$4 Million Fees Agreement].
> I do not remember when during the day I signed it and I
> do not have any records showing this.  The document was,
> in fact, a draft of an agreement between BCP and HNA.
> This fact was not clear to me at the time I signed
> because, I'm embarrassed to admit, I did not read the
> document.  I am not even sure that I was given a copy of
> the entire document; I may have been given only the
> signature page.
>
> . . . .  In the press of the circumstances and my naiveté,
> I became confused and assumed without confirming that the
> unsigned copy of [the $4 Million Fee Agreement] was a
> document that had something to do with the formation of BHK
> Partners, and I signed the signature page in that belief.

(Ex. KK ¶¶ 15-16.)  This earlier testimony lends support to the

theory that Chopra did not tell Yan to specifically sign the $4

Million Fee Agreement, and that Yan was simply confused when

told to sign another agreement.  Yan's emails around December

23, 2007 also tend to support his testimony that he may have

been confused. (Ex. F.)  In them he references both the "BHK-

Mitsubishi agreement" and the "BHK-Bravia-HNA agreement," which may have led to his misunderstanding of which "BHK" agreement he was signing.

The next allegation of perjury concerns certain quarterly payments that Mitsubishi was required to pay HNA Group pursuant to their "forward purchase" agreement.  The Cayman Islands BHK Partners 1 Limited sent an invoice to MCAP and requested that the quarterly payments be made to BHK Partners 1 Limited. (Ex. CC.)  Fike characterizes this as a request to pay Bravia directly, but the invoice says that it will be "For Further Credit To:  Bravia Capital Partners." (Id.)  Fike also claims that Bravia's revenue journal reports this as "fee income" from HNA, but the actual journal refers to those payments as "BHK Deposit Interest." (Ex. LL.)  Moreover, she claims that bank records indicate that payments were made directly from MCAP to Bravia's Signature Bank account. (Ex. FF.)  But the document she cites lists the Cayman Islands BHK Partners 1 Limited as the beneficiary of the transfer.  It is thus unclear to the Court how these documents support Fike's argument that these payments were diverted to Bravia's bank account on behalf of the Japanese Agent.

Next, Fike claims that Bhise lied about the Japanese Agent referenced in the $4 Million Fee Agreement.  Bhise testified in

his deposition that he thought the Japanese Agent was Edogawa

Aerospace:

> Q. So, the Japanese agent, is that Edogawa?
> A. I believe so.

(Bhise Tr. 434.)  Bhise now says that Edogawa Aerospace

could not be the Japanese Agent referred to in the

agreement. (Bhise Decl. ¶ 54.)

To support her claim that Bhise lied, Fike points to an

email where she claims Bhise led HNA Group to believe that the

Japanese Agent was an ANA employee (Ex. C.)  Although Bhise

refers to the ANA employee as simply "Agent," the chart included

in his email refers to a "Japanese Agent" that is apparently

entitled to the $1 million Bhise claims will be due to the

"Agent" upon closing.

Fike attempts to buttress the connection between the

"Agent" referenced in the email and the "Japanese Agent"

mentioned in the $4 Million Fee Agreement with Liu's deposition.

However, Liu's testimony is more confusing than enlightening:

> Q. Was it also your understanding with respect to
> paragraph 10 [of the $4 Million Fee Agreement] that there
> was a Japanese agent who was to receive an additional $1
> million as a fee?
> A. Yes.
> Q. Do you know who the Japanese agent was that was
> referred to in this document?
> A. Japanese employee at time.
> Q. It was your understanding that the Japanese agent who
> appears on paragraph 10 of the Exhibit 1 fee agreement
> was a person from ANA; is that correct?
> A. Yes. (Liu Tr. 20.)

35

> Q. . . . . [Referring again to Paragraph 10] was it
> your understanding that the Japanese agent was the same
> person that Mr. Bhise was referring to in his December
> 17, 2007 email . . . .
> A. Yes.
> Q. Did you ever learn the name of the ANA person who was
> the Japanese agent?
> A. No, never.
> Q. Did you ever hear from anyone within the purchasing
> department at HNA or from anyone else, for that matter,
> that the Japanese agent was someone from Turkey?
> A. No.
> Q. Did you learn at some time that the Japanese agent
> was R.F. Edogawa?
> A. Yes, we have an agreement.
> Q. Did you have a written agreement with R.F. Edogawa?
> A. Yes.
> Q. Did you understand Edogawa to be the same Japanese
> agent that appears on Bravia's fee agreements, paragraph
> 10?
> A. Yes.
> Q. Did you understand Edogawa was the same Japanese agent
> referred to in the email on Exhibit 5?
> A. Yes.

(Liu Tr. 24-25)  It is unclear how the "Japanese Agent" can

be both (1) an employee of ANA whom Liu never learned the

name of and (2) a limited liability company that he did

learn the name of and has an agreement with HNA.  Rather,

it is plausible that the references to the Japanese Agent

do not share a common meaning.  Whoever or whatever the

Japanese Agent may be, Fike has not established that Bhise

lied about it.

    Fike also asserts that Yan lied when he said that he did

not know "what Japanese agent is being referred to in the [the

$4 Million Fee Agreement]." (Yan Tr. 104.)  Although he

transmitted the Edogawa Side Letter with an email containing the text "see below the original signed documents between BHK and the Japanese Agent" (Ex. Q.), there is no indication that he has any awareness of what the document contains or its relation to the $4 Million Fee Agreement.  Moreover, while it would seem to be the most natural explanation, it is unclear that his use of the "Japanese Agent" in the email was meant to coincide with the term "Japanese Agent" as defined in the $4 Million Fee Agreement.

Fike also states that Fran Mikaloff, Bravia's Director of Administration, said that "Bravia's files related to Edogawa had been 'sent out,' to Turkey to avoid production in discovery." (Def. Mem. 26.)  This mischaracterizes Mikaloff's testimony. Mikaloff admits that the documents were sent "either to Turkey or possibly to an attorney in Cypress," but she understood that they were sent because they "had to do with a transaction that Mr. Cizmeci was involved in." (Mikaloff Tr. 352.)  She does not say that they were sent out to avoid production.

Defendant also suggests that the following deposition testimony from Bhise is false:

    Q. Did you send Mr. Liu an invoice for $925,000?
    A. No.
    Q. Was there reference to any documentation whatsoever for
    the $925,000?
    A. No.  It doesn't work like that.

(Bhise Tr. 434.)  Fike argues that it did "work like that" because Bhise referred to "the fees" in his December 17, 2007 and April 3, 2008 emails.  However, as explained above, the fees in the April 3 email are given only as a lump sum and it is unclear whether the December 17 email reflects the fees that would be in the final agreement.

Fike also argues that Bravia has lied about the Avion Deal. Specifically, she asserts that Bhise has falsely claimed to earning only $188,000 in fees, supposedly noted in the "revenue journal" as part of the larger $3.35 million deposit related to the ANA-Mitsubishi Deal. (Exs. LL, MM.)  Bhise testified that "Mr. Liu" told him to allocate the $188,000 to the Avion Deal. (Bhise Tr. 431.)  In his deposition, Bhise clarifies that "Mr. Liu" is Liu Fang.  Fike claims that Liu Fang must be Liu Hui Feng, and Feng denies having such a conversation with Bhise. Bhise now claims that it was actually Liu Dao Qi to whom he was referring.  (Bhise Decl. ¶¶ 118–121.)  There does not appear to be an actual Liu Fang, and Bravia provides no explanation for why Bhise said "Liu Fang."  However, without more, Liu Hui Feng denying that he had this conversation with Bhise does not establish that Bhise lied about it.

Next, Fike points to an email from Chopra to HNA Group requesting the following payments:  $3.127 million to Mitsubishi (wired to Bravia first); $25,000 in legal fees; and $200,000 to

38

the "Japanese Agent," totaling $3.352 million. (Rubin Decl. Ex.
M.)  Concerning the $200,000 fee, the email notes that Bravia
"will send you an invoice and wiring instructions on behalf of
the agent." (Id.)  Bravia apparently follows up as reflected in
Exhibit N, which includes an invoice from the Cayman Islands BHK
Partners 1 Limited for $200,000 (along with invoices for the
other amounts referenced in Exhibit M).

This $200,000 invoice is troubling for Bravia because it
includes the line "For Further Credit To:  Bravia Capital."
That bolsters Fike's claim that this shows that $188,000 was not
earmarked for the Avion Deal. (Mem. 33.)  But, assuming that the
Japanese Agent referenced in the email is Edogawa Aerospace,
Edogawa Aerospace apparently received $199,985.00 according to
its wire transfers. (Decl. Ex. OO.)  This would free up the
$188,000 to be earmarked as Bhise suggests, so the Court cannot
conclude that Bhise lied.  This disputed fee is discussed more
below as it is included on a document that was allegedly altered
by Bravia.

Also casting doubt on the $188,000 fee agreement, Bravia
produced a structuring agreement that indicated $400,000 in fees
to Bravia from Avion. (Ex. AA.)  Bhise explained that, as
reflected on the revenue journal, the $400,000 represented
different payments:  $287,000 and $113,000 for work done on two
different airplanes. (Bhise Tr. 457.)  Bhise, however, also

admits to receiving additional fees in both cash and equity.
(Bhise Tr. 344-50.)  Whatever the evidentiary value of the
$400,000 agreement, Fike has not established that Bravia has
lied about the $188,000 agreement.

Having reviewed Fike's allegations of perjury, the Court
concludes that she has not established that any of Bravia's
witnesses perjured themselves.  Therefore, there is no need for
a sanction.

### 4. Altered Documents

Finally, Defendant asserts that Bravia tampered with two
pieces of evidence.  Fike claims Bravia manufactured evidence
concerning the Avion Deal.  Bravia initially produced a revenue
journal that had a note that $188,000 of a $3,351,982.00 deposit
from HNA had been earmarked for "BMY Partners Fees," indicating
that it was related to the Avion Deal.  Bhise submitted a
redacted version of the original revenue journal as Exhibit E to
his June 25, 2012 declaration. (Ex. MM.)  It was also included
as Exhibit C to Frank T. Mikaloff's October 11, 2010 affidavit.
(Id. Ex. LL.)

Bravia later produced an updated revenue journal that had a
note apparently indicating that the $188,000 fees were related
to the ANA-Mitsubishi Deal, not the Avion Deal:  instead of BMY
Partner Fees, it now said "BHK Partner Fees."  Although the
updated revenue journal was turned over to Fike shortly before

Bhise's deposition on April 10, 2013, it does not appear as though Bravia ever submitted it as part of a declaration to the Court.[4]  Indeed, Bhise addressed the discrepancy during his deposition, where he claims that his accountant thought "BMY Partners Fees" was a misprint and "fixed" it to read "BHK Partners Fees" while he was making corrections to the revenue journal. (Bhise Decl. 442-43.)

It is not clear to the Court which of the two documents Fike is characterizing as manufactured, and she offers nothing in the way of evidence to contradict Bhise's explanation for the change.  While Bhise's account is perhaps too convenient, it also is entirely plausible considering the other two notations referring to the $3.35 million deposit refer to BHK Partners. Thus, absent evidence to the contrary, the Court credits Bhise's explanation at this time.

Moreover, since the Court cannot find an exhibit where someone representing Plaintiff swore to the updated revenue journal's authenticity, there can be no sanction for lying under oath.  Whatever sanctions may have been appropriate for Plaintiff providing Defendant with a mistakenly altered document, Defendant did not seek them, instead framing the problem as a falsehood communicated to the Court under oath.

---

[4] Plaintiff's counsel conceded during oral argument that he believed it had been submitted to the Court, but Defendant has not pointed to it and the Court has been unable to locate it.

Defendant also asserts that Bravia submitted a copy of the $1.5 Million Fee Agreement with a forged signature. Bhise now admits that he submitted a copy of the $1.5 Million Fee Agreement that he knew to be a forgery as an exhibit to one of his earlier declarations. (Bhise Decl. ¶¶ 71–82) Although Bhise holds fast to his claim that he did in fact execute the $1.5 Million Fee Agreement in India, he now admits that he does not have a copy that was executed by an HNA representative at that time. He claims that unbeknown to him at the time, Rasik Chopra forged the signature of an HNA representative. Bhise later found out about the forgery, but nevertheless signed a declaration submitted to the Court that included an exhibit containing what appeared to be a fully executed copy of the $1.5 Million Fee Agreement, but in fact contained Chopra's forgery. (Ex. II, ex. E; Bhise Decl. ¶¶ 74–80.) His declaration claimed that the exhibit was a "true and complete copy of the letter agreement between plaintiff and HNA that both parties executed on December 26, 2007." (Ex. II ¶ 35.) Bhise claims that he did not carefully review the exhibits to the declaration and did not mean to submit the forged document. (Bhise Decl. ¶¶ 75–79.) Although he eventually realized what had happened and disclosed the issue, he did not so until after the Court ruled on the motion to which he submitted his declaration in support. (Id. ¶ 82.)

The submission of false documents is clearly sanctionable. See Passlogix, 708 F. Supp. 2d at 394–95; see also Amerisource Corp. v. Rx USA Int'l Inc., No. 02 Civ. 2514, 2010 WL 2730748, at *8 (E.D.N.Y. July 6, 2010) (imposing fine of $50,000 for submitting altered emails).  Plaintiff's counsel acknowledged as much when pressed by the Court at oral argument. (Tr. 23 ("Yes, your Honor.  I believe it probably is sanctionable . . . .") However, Fike has not established that Bhise had a culpable state of mind beyond negligence.  Moreover, in responding broadly to Fike's fraud on the court claim, Bhise has not had an opportunity to address specific sanctions for submitting a false declaration.  Thus, at a later date, the Court will order Bhise to show cause why he should not be personally sanctioned for submitting his declaration with an exhibit containing an admittedly forged signature.

### D. Fraud on the Court Determination

In sum, the Court has found that Bravia spoliated three emails and submitted one forged document as an exhibit to this Court.  Bravia did not wrongfully withhold the Supplemental Documents, and none of Bravia's witness perjured themselves. While Fike has alleged a massive fraud on this Court, she seemingly lost the trees for the forest by failing to establish many of the individual wrongs she intimates.  Thus, Defendant

has not shown that Bravia committed a fraud on the Court or that entry of a default judgment is an appropriate sanction.

While the Court concludes that Fike has established that there have been some improprieties, she has not established that Plaintiff's actions were the product of intentional bad faith such that Bravia created an "unconscionable scheme" to defraud this Court. Moreover, although there was more than one instance, the Court cannot conclude that they represent a pattern of misbehavior rather than separate, isolated instances of negligence. Therefore, Fike's request for entry of a default judgment is denied.

While Fike has not established that any one statement was a lie under oath, the Court is concerned with the amount of uncovered evidence that is damaging to Bravia's version of events. There will be at least two hearings, Bhise's response to the order to show cause, perhaps a renewed motion for summary judgment, and ultimately a trial. Given the Court's concern, it will remind Plaintiff that perjury, even in a civil action, is a crime. See 18 U.S.C. § 1623; United States v. Cornielle, 171 F.3d 748, 751 (2d Cir. 1999); Ades v. 57th St. Laser Cosmetica, LLC, No. 11 Civ. 8800, 2013 WL 2449185, at *12–13 (S.D.N.Y. June 6, 2013). All counsel are directed to inform any of their witnesses of the criminal penalties for perjury.

### III. Conclusion

For the foregoing reasons, Defendant's motion for sanctions is denied. The Court will hold a status conference on April 14, 2015, at 11:45 a.m. in Courtroom 20-C of the Daniel Patrick Moynihan U.S. Courthouse to discuss how it will proceed with (a) Plaintiff's previously withdrawn motion for summary judgment; (b) the hearings referenced in the above opinion; and (c) Bhise's order to show cause.

**SO ORDERED.**

Dated:    New York, New York
          March 25, 2015

_John F. Keenan_
JOHN F. KEENAN
United States District Judge